UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

MARY KAY, INC.,                          )
                                         )
             Plaintiff,                  )
                                         )        CIVIL ACTION NO.
VS.                                      )
                                         )        3:08-CV-0776-G
AMY L. WEBER, ET AL.,                    )
                                         )        **ECF**
             Defendants.                 )


## <u>MEMORANDUM OPINION AND ORDER</u>

Before the court is the motion of the defendants, Amy L. Weber, Scott J.

Weber, and Touch of Pink Cosmetics (collectively "the defendants" or "the

Webers"), for summary judgment. For the reasons discussed below, the motion for

summary judgment is granted in part and denied in part. Additionally, the

defendants have moved to strike the results of a survey conducted by Kent D. Van

Liere ("Van Liere"). The plaintiff, Mary Kay, Inc. ("Mary Kay"), relies on these

survey results in arguing that the defendants are not entitled to summary judgment.

The court will therefore address that motion in this order, as well. For the reasons

discussed below, the motion to strike is granted in part and denied in part.

# I.  BACKGROUND

Mary Kay is a manufacturer and wholesale distributor of cosmetics, toiletries,

and skin care products.  Defendants' Motion for Summary Judgment and Brief in

Support ("Motion for Summary Judgment") at 2.  On January 27, 2000, Amy Weber

became an Independent Beauty Consultant ("IBC") for Mary Kay.  *Id.*  An IBC is an

independent sales representative who sells Mary Kay products to consumers at

whatever price she chooses.  *Id.*  In order to remain an active IBC, Amy Weber was

required to order at least $200 worth of products each month.  In September of

2004, Amy Weber placed the last order that qualified her as an IBC.

Although she was no longer purchasing new Mary Kay products, Amy still had

a large inventory of products she had been unable to sell as an active IBC.  To dispose

of her "leftovers," the Webers began selling the products via eBay, Inc. ("eBay") in

early 2005.  *Id.*  After the couple sold all their inventory, they purchased more Mary

Kay products through eBay at a low price, and later re-sold it at a higher price.  As

business grew, the Webers began to receive inquiries from individuals who wished to

sell them Mary Kay products.  *Id.*  The Webers decided to set up an eBay store called

"marykay1stop" to sell all the Mary Kay products they were amassing.  *Id.* at 3.

On approximately June 16, 2005, Mary Kay received an e-mail informing it

about the presence of marykay1stop.  *Id.*  As a result, Mary Kay sent Amy Weber a

letter which said that by offering Mary Kay products on eBay, she was in violation of

her IBC agreement. *Id.* After receiving no response, Mary Kay sent a second letter on July 29, 2005. *Id.* Again, Mary Kay received no response. On August 19, 2005, Mary Kay terminated the IBC agreement between Amy Weber and Mary Kay. *Id.* On November 3, 2005, Mary Kay contacted eBay and complained of the Webers' use of the Mary Kay name in marykay1stop. *Id.* Mary Kay sent a letter to Scott Weber demanding that he stop using Mary Kay's name in the marykay1stop store. *Id.* at 3-4. In response to this letter, Scott Weber contacted Nancy Pike ("Pike"), a paralegal in the Mary Kay legal department. *Id.* at 4. The Webers claim Pike told Scott that he could continue running the online store so long as he changed the name of the store so as to not include Mary Kay trademarks and removed all photographs copyrighted by Mary Kay. *Id.*

As a result of the conversation with Pike, the Webers changed the name of the store to Touch of Pink and created touchofpinkcosmetics.com, independent of the eBay store. *Id.* The couple also removed all copyrighted Mary Kay images from their websites. *Id.* By doing so, the Webers complied with all of Mary Kay's requests. *Id.* Today, the website touchofpinkcosmetics.com, and the Touch of Pink eBay store continue to sell Mary Kay products. The websites use the Mary Kay name "mainly to identify the brand of products they buy and sell and to disclaim affiliation and association with Mary Kay." *Id.* at 5. All the products sold by the defendants were

purchased from current or former Mary Kay IBCs.  The defendants do not alter the products they sell in any way.  *Id.*

In May of 2008, Mary Kay filed this suit against the defendants.  The original complaint asserts eight causes of action:  (1) tortious interference with an existing contractual relationship, (2) tortious interference with a prospective relationship, (3) unfair competition under the Lanham Act, (4) passing off under the Lanham Act, (5) trademark infringement under the Lanham Act, (6) unfair competition under Texas common law, (7) trademark infringement under Texas common law, and (8) unjust enrichment.  Original Complaint for Damages and Injunctive Relief and Motion for Leave to Conduct Expedited Discovery ("Complaint") ¶¶ 46-76.  The defendants now move for summary judgment on the majority of these claims, and on their affirmative defenses.

## II. ANALYSIS

### A.  Objections to the Summary Judgment Evidence

The Webers argue that some of the evidence presented by Mary Kay will be inadmissible at trial and is therefore not properly considered on a motion for summary judgment.  The court will first consider these objections.

#### 1.  *Objection (1):  Hearsay*

The defendants object to the e-mails attached as an exhibit to the affidavit of Terry Kniep ("Kniep"), a Mary Kay employee.  Appendix in Support of Mary Kay

Inc.'s Response in Opposition to Defendants' Motion for Summary Judgment ("Appendix to Response") at APP000664-APP00665 (attached as Exhibit 15). Kniep's affidavit states that a chain of e-mails Mary Kay received was kept by Mary Kay in the regular course of business. *Id.* These e-mails were sent to Mary Kay by a third party, Yvonne Quiles ("Quiles"), complaining that she had received the wrong product from touchofpinkcosmetics.com. The defendants object that the court should not consider these e-mails because they are hearsay. Defendants' Reply in Support of Their Motion for Summary Judgment and Brief in Support ("Reply") at 2.

The plaintiff, however, asserts that these e-mails are not hearsay because they are not offered for "the truth of the matter asserted." FED. R. EVID. 801(c). Instead, Mary Kay argues, they are offered to demonstrate the confusion the customer must have had if she contacted Mary Kay about an erroneous order she received from touchofpinkcosmetics.com. Surreply Regarding Defendants' Objections to Mary Kay's Summary Judgment Evidence at 2. The Fifth Circuit has held that phone calls made to the wrong company are admissible evidence to demonstrate confusion. *Armco, Inc. v. Armco Burglar Alarm Company, Inc.*, 693 F.2d 1155, 1160 n.10 (5th Cir. 1982). In *Armco*, the court stated that "[t]he testimony about phone calls . . . was not being offered to show that Armco and Armco Burglar Alarm were the same business, but to show that people *thought* they were." *Id.* (emphasis in original). Here, the e-mails are not offered to demonstrate that the customer received the wrong product

- 5 -

from touchofpinkcosmetics.com, but to demonstrate confusion. Even if the court views the e-mails as the equivalent of the statement, "I believe Mary Kay and touchofpinkcosmetics.com are the same company," -- in which case the e-mails would be offered for the truth of the matter asserted -- such a statement is admissible under Federal Rule of Evidence 803(3), the state of mind exception. *Id.*

The Webers also contend that the e-mails are inadmissible because they are irrelevant. Under Federal Rule of Evidence 401, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The parties seem to agree that if the e-mails demonstrate confusion, they are relevant. The Webers, however, argue that these e-mails do not demonstrate actual confusion because Quiles, the woman complaining of the erroneous order, knew she had ordered from touchofpinkcosmetics.com, and merely "chose to complain about them to Mary Kay." Defendants' Surresponse to Plaintiff's Surreply Regarding Defendants' Evidentiary Objections ("Surresponse") at 2. The court disagrees. Quiles' e-mails could suggest to a reasonable juror that she believed Mary Kay and touchofpinkcosmetics.com to be the same entity. Quiles states, "this was my first time ordering with *your* company" and later adds, "I placedn [sic] order ha [sic] *you* sent that was incorrect." Appendix to Response at APP00667-APP00668 (emphasis added). Her use of the word "you" indicates that she believed she had

ordered and received the product from Mary Kay -- the entity to whom she sent the e-mail.  The court finds the e-mails are relevant because they tend to show that consumers were confused about touchofpinkcosmetics.com's affiliation with Mary Kay.

## 2.  *Objection (2):  Failure to Timely Disclose Witnesses*

The Webers argue that Mary Kay failed to timely disclose the two witnesses who provide declarations attached as Exhibits 2 and 16 to the Appendix to the Response.  Reply at 3.  Additionally, they argue that the plaintiff did not timely produce the documents attached to Exhibits 2, 15, and 16 to the Appendix to the Response.  *Id*.  Under Federal Rule of Civil Procedure 26(a)(3)(A), Mary Kay is required to disclose to the Webers the names, address and telephone number of each witness it may present at trial, as well as any document or other exhibit the party expects to or may offer.  The witnesses who provided the declarations attached as Exhibits 2 and 16, as well as the documents attached to Exhibits 2, 15, and 16, must be disclosed under this rule.  At the time these objections were made, however, the deadline for Mary Kay to make such a disclosure had not yet passed.  The court issued a scheduling order on September 16, 2008, which set February 6, 2009 as the deadline for the parties to make all the disclosures required under Rule 26(a)(3), F.R. CIV. P.  Although that date has since passed, the objection was nevertheless premature.  Mary Kay still had time to formally disclose the documents at issue.

Furthermore, as a practical matter, the defendants will not be prejudiced by the court considering the evidence at issue here. The discovery deadline had also not passed at the time the defendants filed these objections. Thus, the defendants still had time to depose witnesses and request further documents. Under Federal Rule of Civil Procedure 37, a failure to disclose evidence as required by Rule 26 does not preclude the court from considering that evidence if the failure was substantially justified or is harmless. Here, not only is any failure to disclose harmless, there was -- at the time the objection was made -- no failure at all. The court will therefore consider the declarations attached as Exhibits 2 and 16, and the documents attached to Exhibits 2, 15, and 16.

### 3. *Objection (3): The Survey is Unreliable*

The defendants next object to the survey conducted by Van Liere. Reply at 4. The defendants have filed a separate motion to strike Van Liere's evidence. The court addresses that motion here. Van Liere surveyed 303 consumers to determine whether they believed the touchofpinkcosmetics.com website was affiliated with Mary Kay. Appendix to Response at APP0031-APP0043. The Webers argue that the survey was flawed because the participants were required to tell the surveyors whether touchofpinkcosmetics.com was affiliated with Mary Kay without defining the word "affiliated." Reply at 4. The Webers also complain that the survey did not take into account the interviewees' explanation of their belief that the website was or was not

affiliated with Mary Kay. *Id.* Those explanations reveal that some interviewees believed the website was affiliated with Mary Kay only because it sells Mary Kay products. The Webers argue those interviewees' responses should not be counted because, under the first sale doctrine, the Webers are allowed to "legitimately re-sell genuine branded Mary Kay products." *Id.* In other words, they contend that affiliation cannot stem from selling Mary Kay products alone, and to the extent the interviewees believed affiliation did stem solely from that fact, their response should not be counted.

The court agrees that the responses of interviewees who believed affiliation existed solely because the website sells Mary Kay products are inadmissible. As discussed below, the court finds there is a genuine issue of fact as to whether the first sale doctrine applies. The court will therefore submit that question to the jury. The court will also instruct the jury that, under federal law, if the Webers have improperly suggested affiliation with Mary Kay, the first sale doctrine does not apply. *Scott Fetzer Company v. House of Vacuums, Inc.*, 381 F.3d 477, 484 (5th Cir. 2004). Actual evidence of consumer confusion could sway the jury to believe that the Webers have improperly suggested affiliation. Under the first sale doctrine, however, something more than actual confusion is required. The defendants must have done something improper that *caused* the confusion. See *id.* at 487. Merely reselling a trademark holder's genuine product is not improper. Thus, confusion that stems solely from the

fact that the Webers are reselling Mary Kay products is not legally relevant and might confuse the jury. As a result, the court cannot allow the jury to hear the bald statement that forty five percent of consumers were confused about touchofpinkcosmetics.com's affiliation with Mary Kay. That statistic is based on some legally irrelevant confusion.

Van Liere, however, did not only ask whether the interviewees believed the Webers' website was affiliated with Mary Kay. He also asked them to explain their answer. These explanations provide evidence of actual confusion without hiding the reason behind the confusion. In looking at these explanations, the court can easily distinguish legally relevant confusion from legally irrelevant confusion. The court will therefore not bar the results of Van Liere's survey altogether. It will consider the explanations provided. It will not, however, consider the bald fact that forty five percent of interviewees were confused about the affiliation of Mary Kay and touchofpinkcosmetics.com.

The defendants also object to the methodology of Van Liere's survey. Defendants' Objection to and Motion to Strike Plaintiff's Expert Kent D. Van Liere and Brief in Support ("Motion to Strike") at 7. They contend that the control website Van Liere used was improper, that the question was leading, and that distinction between the control website and touchofpinkcosmetics.com is not the "key characteristic" being tested. *Id.* at 7-8. However, technical inadequacies in a

survey, "such as the format of the question or the manner in which it was . . . taken," bear on the weight of the evidence, not its admissibility. *C. A. May Marine Supply Company v. Brunswick Corporation*, 649 F.2d 1049, 1055 n.10 (5th Cir.), *cert. denied*, 454 U.S. 1125 (1981); *Holiday Inns, Inc. v. Holiday Out In America*, 481 F.2d 445, 447 (5th Cir. 1973) ("the district court properly admitted the survey evidence in this case, leaving the format of the questions and the manner of conducting the survey for consideration as to the weight of this evidence.").  The court finds that the errors the defendants complain of are the type of methodological flaws best weighed by the jury.

In sum, the court will consider some of the results of Van Liere's survey, and will look, especially, to the interviewees' explanations of their confusion.  The court will not consider, or allow the jury to hear, the bald assertion that forty five percent of interviewees were confused about Mary Kay's affiliation with touchofpinkcosmetics.com.  Only some of that confusion is legally relevant.  The legally irrelevant confusion must be weeded out before the evidence can be presented to the jury.

### 4. *Objection (4):  The Declaration of Nancy Pike Contradicts Her Earlier Deposition Testimony*

The Webers next object to paragraph five of the declaration of Nancy Pike. Reply at 5.  The defendants contend that in this paragraph, Pike contradicts her earlier deposition testimony regarding her conversation with Scott Weber.  According

to the Webers, "Mary Kay attempts to improperly create a fact issue on the defense of laches by having Ms. Pike embellish her testimony via Declaration." *Id.* The defendants cite the rule that a witness cannot contradict her own testimony in order to create a fact issue and avoid summary judgment. *Id.* at 6 (citing *Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162, 1168 (7th Cir. 1996)). While true, Pike's declaration does not contradict her earlier deposition testimony. Pike merely elaborates on the testimony given during her deposition.[1] Furthermore, even if Pike's declaration did directly contradict her deposition testimony, the court could still consider it. *Kennett-Murray Corporation v. Bone*, 622 F.2d 887, 893 (5th Cir. 1980) ("In considering a motion for summary judgment, a district court must consider all the evidence before it and cannot disregard a party's affidavit merely because it conflicts to some degree with an earlier deposition."). The court will therefore consider paragraph five of the declaration of Nancy Pike.

### 5. *Objection (5): Interrogatory Answers are Not Verified*

The defendants also object that Mary Kay's answers to the second set of interrogatories -- specifically, Exhibits 6 and 7 -- are not verified and therefore

---

[1] In paragraph 5 of her declaration, Pike states that she never told Scott Weber that "everything would be okay" if he changed the domain name and removed the Mary Kay photographs. Appendix to Response at APP00002. In her deposition testimony, Pike states that she told Scott he needed to comply with the demands in the letter, to cease use of the Mary Kay mark and photographs. Reply at 5. She states that Scott Weber complied with all these requests. She does not, however, state that she told him "everything would be okay" if he complied with those requests. *Id.*

inadmissible under Federal Rule of Civil Procedure 33(b)(3), which states that answers to interrogatories must be made under oath. Reply at 6. The court, however, did not consider either of these exhibits in ruling on the defendants' motion for summary judgment. The objection is therefore moot and will be denied.

6. *Objection (6): The Declaration of Chris Schwegmann is Hearsay*

The Webers' final objection is that the declaration of Chris Schwegmann -- specifically, paragraph 6 and Exhibit D -- is inadmissible hearsay. Reply at 6-7. Exhibit D contains numerous e-mails sent to touchofpinkcosmetics.com by customers complaining of used, damaged, or expired products. These e-mails are out-of-court statements offered for the truth of the matter asserted -- the matter asserted being the matter complained of in the e-mail, *i.e.*, that the products were old, damaged, or expired. The court finds that these e-mails are hearsay not covered by any exception, and are therefore inadmissible.

Despite the fact that the declaration of Chris Schwegmann describes the e-mails as business records, they do not comply with all the requirements of Federal Rule of Evidence 803(6). Although touchofpinkcosmetics.com, the recipient of these e-mails, may have had the habit of meticulously recording all customer complaints, that fact does not qualify the e-mails as records of regularly conducted activity. It is the *authors* of these e-mails who must have been acting in the course of a regularly conducted business activity when they made their complaints. Under Rule 803(6),

the document must be *prepared by* someone acting in the course of a regularly conducted business activity. *Williams v. Remington Arms Company, Inc.*, 2008 WL 222496 at *9-10 (N.D. Tex. January 28, 2008) (holding that customer complaints are hearsay and do not qualify as records of regularly conducted activity under Rule 803(6) because the complaints are not made by persons acting in the course of a regularly conducted business activity).

*Williams* relied on *Rowland v. American General Finance, Inc.*, 340 F.3d 187 (4th Cir. 2003), for support. In *Rowland*, the court held that a customer complaint in the form of a letter was inadmissible hearsay not covered by the business records exception. The court reasoned that if "the supplier of the information does not act in the regular course, an essential link is broken; the assurance of accuracy does not extend to the information itself, and the fact that it may be recorded with scrupulous accuracy is of no avail." *Id.* at 194. Even if the court were to consider the e-mails to be part of touchofpinkcosmetics.com's record of customer complaints, the court would still face a double hearsay problem. *Id.* Although the record of the e-mails would be covered by the Rule 803(6) exception, the e-mails themselves would still have to be covered by some other hearsay exception. They are not. Thus, the e-mails are inadmissible hearsay. The court will not consider them in ruling on the defendants' motion for summary judgment.

## B. Motion for Summary Judgment

### 1. *The Summary Judgment Standard When the Movants Bear the Burden of Proof at Trial*

Summary judgment is proper when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving parties are entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).[2] "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The "part[ies] seeking summary judgment always bear[] the initial responsibility of informing the district court of the basis for [their] motion, and identifying those portions of [the record] which [they] believe[] demonstrate the absence of a genuine issue of material fact." *Celotex Corporation v. Catrett*, 477 U.S. 317, 323 (1986); *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1046-47 (5th Cir. 1996). When, as here, the movants bear the burden of proof at trial on an affirmative defense for which they are moving for summary judgment, the movants must come forward with evidence that establishes "beyond peradventure all the essential elements of the claim or defense to warrant judgment in [their] favor."

---

[2] The disposition of a case through summary judgment "reinforces the purpose of the Rules, to achieve the just, speedy, and inexpensive determination of actions, and, when appropriate, affords a merciful end to litigation that would otherwise be lengthy and expensive." *Fontenot v. Upjohn Company*, 780 F.2d 1190, 1197 (5th Cir.1986).

*Fontenot v. Upjohn Company*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). Defendants moving for summary judgment on an affirmative defense, as here, must make a showing sufficient for the court to hold that no reasonable trier of fact could find other than for the defendants; otherwise, there is a genuine issue of fact and summary judgment cannot be granted. See *Anderson*, 477 U.S. at 248.

Once the moving parties have carried their burden, the nonmovant must then direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323-24. While all of the evidence must be viewed in a light most favorable to the motion's opponent, *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 158-59 (1970)), neither conclusory allegations nor unsubstantiated assertions will satisfy the non-movant's summary judgment burden. *Little v. Liquid Air Corporation*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.), *cert. denied*, 506 U.S. 825 (1992). If the nonmovant's "evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50.

2. *The Defendants' Motions for Summary Judgment*
*on The Three Affirmative Defenses*

a. The First Affirmative Defense:  The First Sale Doctrine

The Webers contend that their sales of Mary Kay products are protected by the first sale doctrine. According to this doctrine, "As a general rule, trademark law

does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner . . . . Thus, a distributor who resells trademarked goods without change is not liable for trademark infringement." *Polymer Technology Corporation v. Mimran*, 975 F.2d 58, 61-62 (2nd Cir. 1992). The Fifth Circuit follows this rule. In *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc. of Lafayette*, 988 F.2d 587, 590 (5th Cir. 1993), the court adopted the doctrine, stating that "trademark law does not apply to the sale of genuine goods bearing a true mark, even if the sale is without the mark owner's consent." The Webers argue that they are merely reselling genuine Mary Kay goods and are therefore not liable for trademark infringement. Motion for Summary Judgment at 11-12.

At first blush, the doctrine appears to apply; after all, the Webers are merely reselling Mary Kay's products. The first sale doctrine, however, does not protect every reselling of trademarked goods. The doctrine does not protect alleged infringers who sell trademarked goods that are "materially" different from those sold by the trademark owner. *Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Company*, 112 F.3d 1296, 1302-03 (5th Cir. 1997). This exception to the broad protection of the first sale doctrine allows mark holders to protect the value of their mark. Were the rule otherwise, mark holders would be forced to sit by helplessly as infringers sold inferior products bearing their mark, devaluing it in the process. Mary Kay contends that the Webers' products are materially different from its own because

(1) they are expired, (2) they do not carry the same product guarantee, and (3) they are old, used, discontinued, or otherwise defective.  Response at 21-24.

The first sale doctrine also will not protect the Webers if they have given off the false impression that they are affiliated with or sponsored by Mary Kay.  *Scott Fetzer*, 381 F.3d at 484 (holding that independent dealers "may use a mark to advertise truthfully that they sell or repair certain branded products so long as the advertisement does not suggest affiliation or endorsement by the mark holder").  The plaintiff argues that the Webers have given off the impression of affiliation with Mary Kay by (1) using Mary Kay's trademarks to "drive Internet traffic to the Touch of Pink" website, (2) sending Mary Kay product catalogs to their customers, (3) identifying themselves as a "Mary Kay retailer" in a written publication, and (4) by using "Mary Kay shopping bags, promotional materials, training videos, and other trappings used by IBCs in good standing."  Response at 24-25.

If Mary Kay establishes a genuine issue of material fact as to whether the Webers' products are materially different, or whether the defendants have given off the false impression of affiliation -- the court cannot grant summary judgment for the defendants on the first sale doctrine.  The court will first examine whether there is a fact question as to whether the Webers' goods are materially different from those sold by Mary Kay.

The plaintiff argues that "the vast majority of the products sold by Defendants are old, expired, discontinued, or otherwise defective." Response at 21. In support of this contention, it points to Amy Weber's statement that approximately seventy five percent of the Mary Kay products the Webers sell are expired. Appendix to Response at APP0422. In addition, Mary Kay points to numerous e-mails the Webers received complaining that their products were old, expired, damaged, or used. Response at 22. As discussed above, however, these e-mails are inadmissible hearsay and the court will not consider them. Thus, the court will consider only whether the Webers' sale of *expired* products "materially differ" from those Mary Kay sells through its IBCs.

Mary Kay cites *Warner-Lambert Company v. Northside Development Corporation*, 86 F.3d 3, 6 (2nd Cir. 1996), in support of its argument that expired products are materially different. Response at 24. In *Warner-Lambert*, the Second Circuit asked whether a distributor of HALLS cough drops was liable for trademark infringement as a result of distributing expired cough drops. *Warner-Lambert*, 86 F.3d at 5-6. There, just as here, all parties conceded that the distributor was selling an expired product. The defendant, however, pointed out that the plaintiff itself sold some stale products. Since both the plaintiff and defendant were selling stale cough drops, the defendant argued that its products could not be "materially different" from the plaintiff's. *Id.* at 6. The court, however, disagreed. It reasoned that the mark holder was not required to use the most "stringent measures of insuring freshness" that were available. *Id.*

Instead, to be entitled to relief, the mark holder had to show only that "(i) it has established legitimate, substantial, and nonpretextual quality control procedures, (ii) it abides by these procedures, and (iii) the non-conforming sales will diminish the value of the mark." *Id.*

The court finds this holding in *Warner-Lambert* persuasive. As the Second Circuit stated, "[t]he purposes of the Lanham Act would not be fulfilled by requiring trademark holders to establish quality control procedures that prevent virtually all departures from established norms before affording relief against sellers who fail to abide by those norms." *Id.* at 7. Mary Kay has presented evidence demonstrating that it has quality control procedures in place. Lance Margheim ("Margheim"), the director of technical information in Research and Development at Mary Kay, testified that the plaintiff places expiration dates on all cosmetic products that have a shelf life of less than three years. Response at 24. According to Margheim, the system of placing "day codes" and expiration dates on all Mary Kay products is intended to "help evaluate and monitor the age of the stock in its warehouses" and "ensure that products are sold to its IBCs to allow them to resell the products to ultimate consumers well before the shelf life for those products expires." Appendix to Response at APP00674. In fact, Mary Kay's Standard Operating Procedure requires that "finished goods with less than one year of shelf life . . . be destroyed." *Id.* at APP00674-APP00675. While these procedures may not be the "most stringent

measures of insuring freshness" available, Margheim's testimony demonstrates that Mary Kay is careful to keep expired products out of consumers' hands.

The only remaining question is whether the Webers, by selling expired goods, will diminish the value of Mary Kay's mark. *Warner-Lambert*, 86 F.3d at 6. The court finds that there is a genuine issue of fact on this question. In *Warner-Lambert*, the court found there was a question of fact as to whether the sale of 300,000 bags of stale cough drops in a small geographic area could negatively affect the value of the HALLS mark. *Id.* at 8. Although all the defendant contended that the addition of 300,000 bags of stale cough drops added "only a fraction to the already stale HALLS cough drops already in the market," the court found this sufficient to create a fact issue. The court reasoned, "[b]ad experiences by concentrations of consumers can lead to communications that mutually reinforce negative impressions about a mark." *Id*. Here, there is no evidence on how many more expired Mary Kay products are available to the public as a result of the Webers' sales. However, the testimony of Amy Weber suggests that she and her husband have been very successful in reaching Mary Kay customers.

According to her deposition, the Webers spend $20,000 each month on advertising. Appendix to Response at APP00407. Specifically, the Webers buy 79 keywords from Google in order to have their website appear in the results when an individual types any one of those 79 keywords into the search engine. *Id.* at

APP00413-APP00414.  Of these 79 keywords, 75 include the name Mary Kay or the name of a Mary Kay product.  *Id.* at APP00414.  More importantly, thirty two percent of individuals who search for one of these 79 keywords, click on the Webers' website.  See *id.* at APP00408.  These numbers suggest that the Webers have attracted a substantial amount of attention among individuals interested in Mary Kay products.  This extensive infiltration into the world of Mary Kay consumers would allow a reasonable juror to conclude that the Webers' expired products are prevalent enough to affect the Mary Kay name.

In light of this conclusion and Margheim's testimony that Mary Kay has implemented and abides by procedures designed to keep expired products out of the stream of commerce, the court finds the plaintiff has identified a genuine issue of material fact as to whether the first sale doctrine applies.  The evidence presented is enough to allow a reasonable juror to conclude that Mary Kay makes legitimate efforts to keep expired products out of the stream of commerce, and that the Webers are hindering that effort to such an extent that they are devaluing the Mary Kay mark.  If the jury so concludes, the first sale doctrine will not apply.  See *Warner-Lambert*, 86 F.3d at 6.  The Webers are therefore not entitled to summary judgment on the affirmative defense of the first sale doctrine.

b. <u>The Second Affirmative Defense:  The
Nominative Fair Use Doctrine</u>

The Webers also assert the affirmative defense of nominative fair use.  Motion
for Summary Judgment at 7.  According to the Fifth Circuit, "[t]he nominative fair
use doctrine provides that 'one who has lawfully copied another's product can tell the
public what he has copied.'"  *Board of Supervisors for Louisiana State University v. Smack
Apparel Company*, 550 F.3d 465, 488 (5th Cir. 2008) (quoting *Pebble Beach Company v.
Tour 18 I Limited*, 155 F.3d 526, 545 (5th Cir. 1998)).  The doctrine also allows the
use of another's mark to "truthfully identify another's goods or services in order to
describe or compare its product to the markholder's product."  *Pebble Beach*, 155 F.3d
at 545.  The right of fair use is not unlimited, however.  "In order to avail oneself of
the nominative fair use defense[,] 'the defendant (1) may only use so much of the
mark as necessary to identify the product or service and (2) may not do anything that
suggests affiliation, sponsorship, or endorsement by the markholder.'"  *Smack Apparel*,
550 F.3d at 489.  In other words, the defendants' "use cannot be one that creates a
likelihood of confusion as to source, sponsorship, affiliation, or approval."  *Id.* at 488
(quoting *Pebble Beach*, 155 F.3d at 546).

The Webers argue that they have used only so much of the Mary Kay mark as
necessary to make clear to their customers that their products were manufactured by
Mary Kay.  They contend they use only the Mary Kay name and do not "use any
registered logos, any distinctive script or pictures, and do[] not mimic the look or feel

of . . . Mary Kay's website." Motion for Summary Judgment at 9. The plaintiff, on the other hand, contends that the Webers have engaged in conduct that prevents them from taking advantage of the fair use defense.

First, the plaintiff argues the defendants have used the Mary Kay mark to do more than merely identify the products it sells. Response at 11-14. Specifically, it points to the Webers' use of the Mary Kay name in its advertisements. According to Amy Weber, the defendants have purchased 79 keywords from the popular search engine Google in order to have their website appear as a "sponsored link" when an individual searches for any of those 79 terms. Appendix to Response at APP00413-APP00414. Of these 79 keywords, 75 include the name Mary Kay or the name of a Mary Kay product. *Id.* at APP00414. Amy Weber estimates that she spends $20,000 each month on this form of sponsored link advertising. *Id.* at APP00407.

The plaintiff argues that "a defendant may not avail itself of the nominative fair use defense where, as here, it uses the plaintiff's marks as Internet keywords." Response at 13. In support of this argument, the plaintiff cites *Standard Process, Inc. v. Total Health Discount, Inc.*, 559 F. Supp. 2d 932, 938 (E.D. Wis. 2008). *Standard Process* held that the nominative fair use defense did not apply where a defendant had used the plaintiff's name "to be placed prominently as a paid advertiser in search engine results." *Id.* at 938. The court stated that the defendant's use of the plaintiff's name to advertise left the court "unable to conclude that [the defendant]

has done 'nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.'" *Id.* at 938-39 (citing *New Kids on the Block v. News America Publication, Inc.*, 971 F.2d 302, 308 (9th Cir. 1992)). As the defendants correctly point out, however, the holding in *Standard Process* was also based on the fact that the defendant had used the pronouns "we" and "our" to refer to the plaintiff's products. *Id.* at 938. Thus, *Standard Process* does not stand for the proposition that the use of advertising through keywords alone makes the fair use defense inapplicable.

Even if *Standard Process* did stand for such a proposition, the court would not follow it. To adopt such a rule would prevent all defendants who advertise via search engines from asserting the fair use defense. In other words, second hand sellers could not advertise on search engines such as Google without facing liability for trademark infringement. At least two courts have held that this is not the rule. *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 463, 520-21 (S.D. N.Y. 2008); *Designer Skin, LLC v. S&L Vitamins, Inc.*, 560 F. Supp. 2d 811, 819-20 (D. Ariz. 2008). In *Tiffany*, the plaintiff, Tiffany, Inc. ("Tiffany"), argued that eBay was infringing on the plaintiff's trademark by purchasing the "Tiffany" keyword so as to generate "sponsored links" on Internet search engines such as Google. *Id.* at 519. The court disagreed, holding that "eBay's use of the term 'Tiffany' in advertising is protected, nominative fair use." *Id.* This court finds the holding in *Tiffany* persuasive. The fair use doctrine allows

second hand sellers to inform customers that it sells a mark holder's product so long as it conveys the information "fairly," *i.e.*, in a way that uses no more of the mark than necessary to identify the product, and does not suggest affiliation or sponsorship. *Smack Apparel*, 550 F.3d at 489. The logical extension of that rule is to allow second hand sellers to *advertise* -- even through the internet -- "fairly," as well.

The court acknowledges that there is an inherent difference between print and television advertisements, and "sponsored link" advertisements, which Mary Kay argues are improper. When a consumer views a print or television advertisement, she sees the ad without first providing any information about her interests. A sponsored link ad, however, does not appear until the user has already expressed an interest in the search term. One could argue that this process inherently suggests some relationship between the search term -- here, Mary Kay -- and the sponsored link -- here, touchofpinkcosmetics.com. To find that this relationship leads to liability for trademark infringement, however, stretches the legal concept of affiliation too far.

A review of cases in which courts have found that defendants' actions improperly suggest affiliation reveals that the word affiliation connotes a much stronger relationship than the one existing between search terms and sponsored links. See, *e.g.*, *Pebble Beach*, 155 F.3d at 546 (stating that defendants who use another's mark to identify their own goods improperly suggest affiliation with the plaintiff's mark); *Smack Apparel*, 550 F.3d at 473-74 (finding that a manufacturer of t-shirts

associated with a University improperly suggested affiliation with the University by using the same color schemes, logos and designs as the plaintiffs, and marketing the t-shirts in a similar manner as the plaintiffs). Whatever relationship exists between search terms and sponsored links, that relationship does not imply affiliation in the same way that the defendants in *Pebble Beach* or *Smack Apparel* implied affiliation.

Moreover, the court is persuaded by the logic laid out in *Designer Skin*, 560 F. Supp. 2d at 819 n.7. There, the court reasoned that the law will destroy the valuable resource that search engines have become if it prevents those search engines from doing what they are designed to do: present users with the information they seek as well as related information the user may also find helpful or interesting. As one commentator put it,

> If a hitchhiker in cyberspace is the prototypical surfer on the Internet, then a hitchhiker's guide would be something highly to be desired, and perhaps even encouraged as a public good and certainly in the public interest. It would seem rather remarkable that in the readily available Internet directories and search engines, something very like the hitchhiker's guide already exists, and it would seem more remarkable still, and a pity, if the law . . . should kill such a resource.

*Id.* (quoting 33 RUTGERS COMPUTER & TECHNOLOGY L. J. 137, 143 n. 15).

The facts of *Designer Skin* are nearly identical to the facts at issue here. There, the plaintiff was a manufacturer of indoor tanning products. *Id.* at 815. The defendant, S&L Vitamins, Inc. ("S&L"), was an internet reseller that purchased the

plaintiff's products from tanning salons and then resold those products through its website. *Id.* S&L also used the plaintiff's trademarks as search engine keywords. *Id.* at 816. The court granted the defendant's motion for summary judgment on the trademark infringement claims, reasoning that the defendant had done nothing more than use the plaintiff's "trademarks to accurately describe the contents of its websites." *Id.* at 820. The court finds the holdings in *Designer Skin* and *Tiffany* persuasive, and similarly holds that the Webers are not barred from asserting the fair use defense as a result of their advertising through Google.

Having held that the Webers' purchase of keyword advertisements from Google does not, in and of itself, make the fair use defense unavailable, the court now examines whether the actual language of the Webers' ad improperly suggests affiliation. "The critical question is whether the advertisement suggests affiliation or endorsement." *Scott Fetzer*, 381 F.3d at 484. Here, the ad in question read: "Mary Kay Sale 50% Off: Free Shipping on Orders over $100 Get up to 50% Off -- Fast Shipping www.touchofpinkcosmetics.com." Appendix to Response at APP00430.[3] This language would appear as the first sponsored link when a Google user typed the name "Mary Kay" into the search engine. *Id.* In determining whether this ad creates a likelihood of confusion as to affiliation or endorsement, the court considers the

---

[3]      As of today, the defendants' sponsored link that appears after typing "Mary Kay" into Google is different. It now reads, "Cosmetics Sale to 80% Off: Same Designer Products at Bargain Prices - Shop Now! www.TouchofPinkCosmetics.com."

following factors, sometimes called the "digits of confusion":  "(1) the type of mark allegedly infringed; (2) the similarity between the two marks; (3) the similarity of the products or services; (4) the identity of retail outlets and purchasers; (5) the identity of the advertising media used; (6) the defendant's intent; and (7) any evidence of actual confusion."  *Scott Fetzer*, 381 F.3d at 484-85.

While these factors provide the general framework with which to analyze the likelihood of confusion, they "do not apply mechanically to every case and can serve only as guides, not as an exact calculus."  *Id.* at 485.  For example, in *Scott Fetzer*, the court discussed two hypothetical newspaper ads, "one reading 'Your Kirby Headquarters' and the other reading 'Sales & Repairs of Kirby Vacuums (not authorized by Kirby).'"  *Id.*  The court reasoned that while the seven factors might indicate that both ads would lead to confusion, it is clear that only the first ad actually runs such a risk.  *Id.*  Thus, the opinion suggests that when it comes to analyzing the likelihood of confusion arising out of an advertisement, the factors are less helpful than the actual words in the ad.  See *id.*

Here, the wording of the Webers' sponsored link is analogous to the hypothetical ad reading, "Your Kirby Headquarters."  Although the Webers do not state that they are Mary Kay's "headquarters," the language, "Mary Kay Sale 50% Off" does imply that Mary Kay is hosting the sale.  Moreover, the ad is easily distinguishable from other advertisements which have been found not to suggest

affiliation or sponsorship. The Ninth Circuit, for example, held that the following language would not suggest any affiliation, sponsorship, or endorsement: "Why pay for MovieBuff when you can get the same thing here for FREE?" *Brookfield Communications, Inc. v. West Coast Entertainment Corporation*, 174 F.3d 1036, 1066 (9th Cir. 1999) (emphasis in original). This sentence draws a clear line between the advertised service and "MovieBuff." Were the language to read "MovieBuff 50% Off," the line would be far less clear.

The print advertisement in *Scott Fetzer* is also distinguishable. There, the plaintiff argued that because the ad contained the word "New" and the mark "Kirby," one might infer that the defendant was an authorized distributor of new Kirby vacuums. *Scott Fetzer*, 381 F.3d at 484. However, the words were separated by space and many other words. Moreover, the overall message of the ad was that the defendant sold and serviced many types of vacuum cleaners, both used and new. *See id.* at 482. Thus, the court found the ad did not improperly suggest affiliation. Here, the ad stated simply, "Mary Kay Sale 50% Off." Appendix to Response at APP00430. The overall message of the defendants' ad is only that some entity -- whose website, it bears noting, includes the word "pink," a color often associated with Mary Kay -- is offering Mary Kay products at 50% off. One could easily conclude from this ad that the entity offering the sale either *is* Mary Kay, or has Mary Kay's approval. Thus, the court finds there is a genuine issue of material fact on the

applicability of the fair use defense.  A reasonable juror could conclude that the Webers, through the language of their sponsored link advertisement, improperly suggested affiliation with Mary Kay.  Were the jury to reach that conclusion, the fair use defense would not apply.  The defendants are not entitled to summary judgment on the grounds that the fair use defense protects their use of the Mary Kay name to advertise their website.

The bigger question, however, is whether the actual website, touchofpinkcosmetics.com, uses the Mary Kay trademark in a way that is protected by the fair use doctrine.  The court's holding would be incomplete were it to conclude only that there is a question of fact as to whether the fair use defense applies to the way the Webers advertised.  The plaintiff's larger concern is plainly that the Webers' website, touchofpinkcosmetics.com, gives off the impression of being sponsored by or affiliated with the plaintiff.  *See* Response at 14-20.  The Webers contend that no reasonable juror could conclude the website improperly suggested affiliation because the website includes statements disclaiming affiliation, and never affirmatively suggests affiliation.  Motion for Summary Judgment at 9-11.  The court now examines that assertion.

To determine whether there is a likelihood that consumers are confused about touchofpinkcosmetics.com's affiliation with Mary Kay, the court looks to the factors laid out in *Scott Fetzer*, the so-called "digits of confusion."  *Scott Fetzer*, 381 F.3d at

484-85.  First, the marks used by the Webers and Mary Kay are identical:  both

parties use the name "Mary Kay."  Next, the similarity of the products offered also

weighs in favor of confusion, since they are also identical.  On the identity of retail

outlets and purchasers, there are no retail outlets that sell Mary Kay products.

However, the identity of the purchasers is likely identical or at least very similar, since

both Mary Kay and the Webers target individuals interested in the Mary Kay brand

of cosmetics.  The advertising media used by Mary Kay and the Webers is very

similar.  Although Mary Kay markets its products through IBCs, it also offers its

products for sale through the Internet, just as the Webers do.  Moreover, both parties

advertise using Google.

The sixth factor looks at the defendants' intent.  The defendants' website does

include a disclaimer, stating that touchofpinkcosmetics.com is not endorsed by or

affiliated with the plaintiff.  This disclaimer suggests that the defendants did not

intend to confuse customers.  However, as the plaintiff points out, the disclaimer is

not prominent on the website.  Response at 19.  In fact, the disclaimer does not

appear unless the individual clicks on the "About Us" link on the website.  *Id.*

Further, at least one court has observed that the existence of a disclaimer "does not

necessarily prevent consumer confusion."  *Pebble Beach Company v. Tour 18 I, Ltd.*, 942

F. Supp. 1513, 1550 (S.D. Tex. 1996), *aff'd as modified*, 155 F.3d 526 (5th Cir.

1998).  Similarly, a disclaimer does not necessarily demonstrate a defendant's intent

not to confuse consumers, especially when that disclaimer is not displayed prominently. With no other evidence available, this factor does not weigh either in favor of or against confusion.

The final factor is any evidence of actual confusion. The plaintiff has presented the court with some evidence of actual confusion. The e-mail exchange between Yvonne Quiles and Mary Kay, as discussed above, demonstrates that at least one individual was confused about whether or not touchofpinkcosmetics.com was run by Mary Kay. In addition, the survey conducted by Van Liere presents evidence of confusion. Although, as discussed earlier, not all the interviewees who claimed to be confused were confused for legally relevant reasons, others were. The results of the survey are therefore not inadmissible as a whole. Taking the legally relevant confusion Van Liere uncovered into account, this factor also weighs in favor of confusion.

With six out of the seven factors weighing in favor of confusion, the court concludes that there is at least a genuine issue of material fact as to whether touchofpinkcosmetics.com suggests affiliation with, or endorsement by, Mary Kay. As a result, the court cannot grant summary judgment on the defendants' affirmative defense of fair use.

c. The Third Affirmative Defense:  Laches

       The last affirmative defense the Webers assert is laches.  In order to prove that laches applies, the defendants must show that (1) Mary Kay delayed in asserting its trademark rights, (2) the delay was unexcused, and (3) the defendants were unduly prejudiced by the delay.  *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 668 (5th Cir. 2000).  The Webers assert that there was a three year delay between the time Mary Kay discovered the Webers' sales on eBay and filed suit.  Motion for Summary Judgment at 15.  Neither party disputes that Mary Kay knew of the Webers' eBay presence by June of 2005.  Mary Kay then sent letters to eBay about their use of the Mary Kay name and photos in November of 2005.  *Id.* at 3.  Finally, on January 6, 2006, the plaintiff sent a letter to Scott Weber.  *Id.* at 3-4.  The defendants assert Mary Kay did not contact them again until May of 2008, when they were served with the original complaint in this case.  *Id.* at 15.  The Webers point to the span of time between June of 2005 and May of 2008, arguing that this period is sufficient to constitute a delay.  *Id.*

       To begin with, the plaintiff argues that the period between June of 2005 and May of 2008 is not the proper time span.  Response at 27-28.  Even if it is, however, three years is not an inexcusable delay.  The Lanham Act does not contain a statute of limitations.  As a result, federal courts refer to analogous state statutes of limitations to aid in determining what length of delay is excusable for purposes of

laches. *Board of Regents, University of Texas System v. KST Electric, Limited*, 550 F. Supp. 2d 657, 667 (W.D. Tex. 2008) (quoting *Wilson v. Garcia*, 471 U.S. 261, 266-67 (1985) ("When Congress has not established a time limitation for a federal cause of action, the settled practice has been to adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so.")). "Although laches is an equitable defense, employed instead of a statutory time-bar, analogous statutes of limitation remain an important determinant in the application of a laches defense [in Lanham Act cases]." *Conopco, Inc. v. Campbell Soup Company*, 95 F.3d 187, 191 (2d Cir. 1996).

In Texas, a "Lanham Act violation is governed by the four year statute of limitations under Texas law." *Edmark Industries SDN. BHD. v. South Asia International (H.K.) Limited*, 89 F. Supp.2d 840, 846 (E.D. Tex. 2000) (citing TEX. CIV. PRAC. & REM. CODE § 16.004; *Derrick Manufacturing Corporation v. Southwestern Wire Cloth, Inc.*, 934 F. Supp. 796, 805 (S.D. Tex. 1996) (applying the Texas four-year fraud limitations period to Lanham Act claims)). Thus, here, the nearly three years Mary Kay allegedly delayed is well within the time period considered reasonable by the relevant statute of limitations. Even if Mary Kay did delay for three years, such a delay is not unreasonable.

Further, the Fifth Circuit has held that any time that elapses after a trademark plaintiff issues a cease and desist letter to the defendant does not count for the

purposes of laches.  See *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188, 205 (5th Cir. 1998).  Mary Kay sent a cease and desist letter on January 6, 2006.  Appendix to Response at APP004-APP005.  This letter demanded that the Webers "cease and desist further use of the MARY KAY mark and photographs and remove all use of the same from your website."  *Id.* at APP004.  Thus, the full three years do not count for purposes of determining the delay.  Even if they did, however, as discussed above, three years is not an unreasonable delay.  The defendant's motion for summary judgment on the defense of laches is therefore denied.

### 3.  *The Summary Judgment Standard When the Movants Do Not Bear the Burden of Proof at Trial*

Summary judgment is proper when the pleadings and evidence before the court show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); see also *Celotex Corporation v. Catrett*, 477 U.S. 317 (1986).  The disposition of a case through summary judgment "reinforces the purpose of the Rules, to achieve the just, speedy, and inexpensive determination of actions, and, when appropriate, affords a merciful end to litigation that would otherwise be lengthy and expensive."  *Fontenot v. Upjohn Company*, 780 F.2d 1190, 1197 (5th Cir. 1986).  While all of the evidence must be viewed in a light most favorable to the nonmovant, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 158-59 (1970)), neither conclusory allegations nor unsubstantiated assertions will satisfy the

nonmovant's summary judgment burden. *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002) (citing *Little v. Liquid Air Corporation*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The movants make the necessary showing by informing the court of the basis of their motion and by identifying the portions of the record which reveal there are no genuine material fact issues. *Celotex*, 477 U.S. at 323. The pleadings, depositions, admissions, and affidavits, if any, must demonstrate that no genuine issue of material fact exists. FED. R. CIV. P. 56(c).

If the movants make the required showing, the nonmovant must then direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323-24. To carry this burden, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 586 (1986). Instead, the nonmovant must show that the evidence is sufficient to support a resolution of the factual issue in its favor. *Anderson*, 477 U.S. at 249. When conflicting evidence is presented, the court is not permitted to make credibility determinations regarding the evidence. See *Lindsey v. Prive Corporation*, 987 F.2d 324, 327 (5th Cir. 1993). The nonmovant

cannot survive a motion for summary judgment, however, by merely resting on the allegations in its pleadings.  *Isquith for and on behalf of Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 199 (5th Cir.), *cert. denied*, 488 U.S. 926 (1988); see also *Celotex*, 477 U.S. at 324.

4.  *The Defendants' Motion for Summary Judgment on the Plaintiff's*
*Claim of Tortious Interference with an Existing Contract*

Under Texas law, a plaintiff must prove four elements to sustain a claim of tortious interference:  (1) that a contract subject to interference exists, (2) that the alleged act of interference was willful and intentional, (3) that the willful and intentional act proximately caused damage, and (4) that actual damage or loss occurred.  *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997).  The Webers argue that they did not knowingly induce anyone to breach his or her contract.  Motion for Summary Judgment at 18-21.  They cite *Davis v. HydPro, Inc.*, 839 S.W.2d 137, 139 (Tex. App.--Eastland 1992, writ denied), which states that in order to demonstrate tortious interference, the plaintiff must show the defendant "*took an active part in persuading a party to a contract to breach it*."  (emphasis in original). *Davis* further states that it is not enough for a defendant to merely enter "into a contract with a party with the knowledge of that party's contractual obligations to someone else."  *Id.*  The Webers contend that they merely purchase Mary Kay products from anyone who contacts them.  Motion for Summary Judgment at 20. They argue they never even know whether that person has a relationship with Mary

- 38 -

Kay, and that the individuals who sell to them "do so of their own volition." *Id.* The

defendants argue that while "Mary Kay may not like the fact that people are selling

[Touch of Pink} goods . . . there is no evidence that [they], in buying the products,

[are] intentionally, maliciously or willfully interfering with any Mary Kay contracts."

*Id*. at 21.

Mary Kay, however, points to a Texas case that has already decided almost this

exact issue. In *Graham v. Mary Kay, Inc.*, 25 S.W.3d 749 (Tex. App.--Houston [14

Dist.] 2000, pet. denied), Mary Kay sought to enjoin Michelle Graham ("Graham")

from selling Mary Kay products she obtained from IBCs at flea markets and from a

cart at a Houston mall. Mary Kay claimed Graham was tortiously interfering with its

contracts with IBCs. *Id.* at 752. The trial court granted summary judgment in favor

of Mary Kay, which the appellate court then upheld. *Id.* at 757. The court reasoned

that Graham had "actively sought current Mary Kay salespersons who were willing to

breach this clause in their agreement and sell their products to Graham." *Id.* at 753.

Further, Graham "knew of this restriction because she had been a beauty consultant,

signed an agreement[,] and was terminated for selling cosmetics at a retail location."

*Id.*

Obviously, *Graham* is highly analogous to the case at hand. Amy Weber was a

former Mary Kay IBC. And she, along with her husband, buys from IBCs who are

willing to sell their Mary Kay products. The defendants' website informs users that it

will buy Mary Kay products.  Response at 32.  Moreover, the defendants send out a monthly newsletter to approximately 50,000 customers, making the same offer to buy Mary Kay products from current IBCs.  Appendix to Response at APP00498.

However, *Graham* is not directly on point.  As the defendants point out, the opinion states that Graham "actively sought" out and "cajoled" IBCs into selling their products.  *Graham*, 25 S.W.3d at 753.  Webster's Dictionary defines "cajole" as "to persuade with flattery or gentle urging especially in the face of reluctance."  WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 195 (1984).  The evidence before this court does not suggest that the Webers cajoled anyone into selling them Mary Kay products.  The court has no evidence of "gentle urging."  Instead, the Webers merely advertised their offer to buy Mary Kay products through their website and newsletter.  The *Graham* opinion does not state exactly how Graham went about cajoling the IBCs into selling her Mary Kay products.  Thus, this court cannot compare the Webers' conduct to hers.  The court's use of the word "cajoling," however, implies that Graham did more than merely offer to buy.

Moreover, there is another Texas case, *John Paul Mitchell Systems v. Randalls Food Markets, Inc.*, 17 S.W.3d 721 (Tex. App.--Austin 2000, pet. denied), suggesting that the Webers have not done enough to be liable for tortious interference under Texas law.  In *Paul Mitchell*, the plaintiff, Paul Mitchell, marketed "its hair care products exclusively to authorized distributors and salons."  *Id.* at 726.  The

defendant, Jade Drug Company, Inc. ("Jade"), obtained Paul Mitchell's hair care products from an authorized distributor and then sold them to a Texas grocery store, which was neither an authorized distributor, nor a salon. *Id.* Paul Mitchell argued Jade had tortiously interfered with the contract that existed between itself and the authorized distributor from whom Jade was obtaining the products. *Id.* at 730. The Texas Court of Appeals disagreed, however, finding that there was not sufficient evidence of Jade's "willful and intentional act of interference." *Id.* at 730-31.

The court in *Paul Mitchell* had nearly identical evidence of the defendant's willful and intentional interference as this court has of the Webers' alleged willful and intentional interference. Mitchell argued that the contract at issue was an exclusive distribution contract, and that Jade undermined the plaintiff's exclusive distribution system with full "knowledge of the closed distribution system and 'with a belief that interference was substantially certain to result.'" *Id.* at 730 (quoting *Southwestern Bell Telephone Company v. John Carlo Texas, Inc.*, 843 S.W.2d 470, 472 (Tex. 1992)). In addition, the president of Jade stated that he "would assume" the authorized distributors were breaching their contract with Paul Mitchell in order to sell the products to Jade. *Id.* Nevertheless, the court stated, "Texas courts have held that to satisfy [the willful and intentional] element of the cause of action for tortious interference, a party must be more than a willing participant." *Id.* The court concluded, "Paul Mitchell does not point to any place in the record where the

evidence establishes Jade's belief that by purchasing Paul Mitchell products from its brokers, it intended to interfere with Paul Mitchell's distribution contracts." *Id.*

In support of this conclusion, the court cited *Arabesque Studios, Inc. v. Academy of Fine Arts, International, Inc.*, 529 S.W.2d 564 (Tex. Civ. App.--Dallas 1975, no writ). There, the court held that "it is not enough that [the defendant] merely reaped the advantages of a broken contract after the contracting party had withdrawn from the commitment on his own volition." *Id.* at 568. Here, the Webers are plainly reaping the benefit of IBCs' willingness to breach their contracts with Mary Kay. However, those IBCs contact the Webers of their own volition. Although the defendants undisputedly advertise their willingness to buy Mary Kay products to anyone who sees their website or newsletter, the ultimate decision to breach the contract is made by the IBCs. More importantly, the record does not show that the Webers exert any influence over those IBCs as they make that decision.

Since Texas law applies to this claim, the court must make an *Erie* guess, see *Erie Railroad Company v. Tompkins*, 304 U.S. 64, 78-80 (1938), about how the Supreme Court of Texas would resolve this issue. See, *e.g.*, *Moore v. State Farm Fire & Casualty Co.*, __ F.3d __, 2009 WL 130204 at *4 (5th Cir. January 21, 2009). Although the *Graham* case, at first blush, seems directly on point, the language of the opinion implies that the defendant there engaged in some activity beyond merely offering to buy the IBCs' inventory. The court is persuaded that the Supreme Court

of Texas would follow the reasoning in *Paul Mitchell* and find that, despite the Webers' knowledge of Mary Kay's closed distribution system, they were ultimately nothing more than willing participants in the IBCs' decisions breach their contracts with Mary Kay. See *Paul Mitchell*, 17 S.W.3d at 730.

The defendants have established that there is no genuine issue of material fact as to the second element of tortious interference: that the alleged interference was willful and intentional. *ACS Investors*, 943 S.W.2d at 430. Without proof of this element, the plaintiff cannot prevail at trial on this claim. The Webers' motion for summary judgment on the claim of tortious interference is therefore granted.

5. *The Defendants' Motion for Summary Judgment on the Plaintiff's Claim of Tortious Interference with Prospective Contracts*

The defendants also move for summary judgment on the plaintiff's claim of tortious interference with prospective relationships. The plaintiff contends that the Webers knew that the Mary Kay business model "contemplates the addition of new Independent Beauty Consultants to sell the Mary Kay products." Complaint ¶ 52. Mary Kay argues that despite this knowledge, the Webers deterred new potential IBCs from ever actually becoming IBCs by retailing Mary Kay products to a mass market. *Id.*

Under Texas law, the elements of a claim for tortious interference with a prospective business relationship are: "(1) a reasonable probability that the plaintiff would have entered into a business relationship, (2) an independently tortious or

unlawful act by the defendant that prevented the relationship from occurring, (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or the defendant knew the interference was certain or substantially certain to occur as a result of the conduct, and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference." *Baty v. ProTech Insurance Agency*, 63 S.W.3d 841, 860 (Tex. App.--Houston [14th Dist.] 2001, pet. denied).

The defendants argue the plaintiff has not presented sufficient evidence to create a genuine issue of material fact on the second or third elements. Motion for Summary Judgment at 21-22. The court agrees as to the third element. Mary Kay's only evidence of the Webers' conscious desire to interfere with Mary Kay's recruitment of potential IBCs is that the defendants' website sells all the "trappings" of an IBC -- *i.e.*, Mary Kay shopping bags, catalogs, samples, promotional items, training videos, etc. -- "without ever having to sign an IBC Agreement with Mary Kay." Response at 35-36. As the defendants correctly point out, however, this evidence proves only that someone might be able to fake the status of an IBC using the products the Webers sell. Reply at 23. There is no evidence that the Webers desire that result or knew that it was substantially certain to occur. Further, there is no evidence that it *has* occurred. In the absence of such evidence, the court concludes there is no genuine issue of fact as to whether the defendants desired or even knew to a substantial certainty that their conduct would interfere with potential IBC

contracts.  The motion for summary judgment on the claim of tortious interference with a prospective contract is granted.

### 6.  *The Defendants' Motion for Summary Judgment on the Plaintiff's Claim of Unjust Enrichment*

Under Texas law, "a party may recover under the unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage."  *Elliott's Hallmark Travel, Inc. v. Laker Airways, Inc.*, 2000 WL 256893, *2 (N.D. Tex. March 6, 2000) (citing *Heldenfels Brothers, Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992)).  Here, the plaintiff argues that the defendants have been unjustly enriched by using the Mary Kay name and mark, and circumventing "the Mary Kay direct sales model by improperly obtaining Mary Kay products through the tortious interference with Mary Kay contracts."  Complaint ¶ 75.  The defendants, however, argue that unjust enrichment does not apply here. They contend that unjust enrichment is "the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances which give rise to an implied or quasi-contractual obligation to repay."  *Walker v. Cotter Properties, Inc.*, 181 S.W.3d 895, 900 (Tex. App.--Dallas 2006, no pet.).  The defendants argue that "this cause of action [is not] at all relevant or related to this case."  Motion for Summary Judgment at 24.

The court agrees.  Unjust enrichment is a quasi-contractual theory.  *DeClaire v. G&B Mcintosh Family Limited Partnership*, 260 S.W.3d 34, 49 (Tex. App.--Houston

[1st Dist.] 2008, no pet. h.).  Moreover, unjust enrichment does not apply when there is a valid contract on which the party can recover.  *Id.*  The same logic suggests that here, where there are other, more specific theories of recovery available -- namely, trademark infringement and tortious interference -- unjust enrichment should similarly not apply.  As Mary Kay admits in its response, "[a]lthough the Lanham Act provides for the disgorgement of Defendants' profits, Mary Kay also seeks to recover . . . based on a theory of unjust enrichment."  Response at 36.  Whatever damages Mary Kay may be entitled to as a result of the alleged violation of the Lanham Act, the plaintiff is not entitled to those same damages under a theory of unjust enrichment, as well.  The defendants' motion for summary judgment on the claim of unjust enrichment is therefore granted.

## III.  CONCLUSION

For the reasons discussed above, the defendants' motion for summary judgment is **GRANTED** in part and **DENIED** in part.  The defendants' motion to strike the expert testimony presented by Van Liere is **GRANTED** in part.

**SO ORDERED**.

February 20, 2009.

_____
A. JOE FISH
**Senior United States District Judge**