UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MARY KAY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| VS. | ) | |
| | ) | 3:08-CV-0776-G |
| AMY L. WEBER, ET AL., | ) | |
| | ) | **ECF** |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court is the motion of the plaintiff, Mary Kay, Inc. ("Mary Kay"), for entry of judgment and for a permanent injunction. For the reasons discussed below, the motion for judgment is granted. The motion for permanent injunction is granted in part and denied in part.

## I. BACKGROUND

The court has laid out the facts of this case in several previous opinions. The following is an excerpt of the facts as discussed in the court's memorandum opinion and order on the defendants' motion for summary judgment.

The plaintiff, Mary Kay, is a manufacturer and wholesale distributor of cosmetics, toiletries, and skin care products.  Defendants' Motion for Summary Judgment and Brief in Support ("Motion for Summary Judgment") at 2.  On January 27, 2000, Amy Weber, one of the defendants, became an Independent Beauty Consultant ("IBC") for Mary Kay.  *Id.*  An IBC is an independent sales representative who sells Mary Kay products to consumers at whatever price she chooses.  *Id.*  In September of 2004, Amy Weber placed the last order that qualified her as an IBC.

Although she was no longer purchasing new Mary Kay products, Amy still had a large inventory of products she had been unable to sell as an active IBC.  To dispose of her "leftovers," the Webers began selling the products via eBay, Inc. ("eBay") in early 2005.  *Id.*  After the couple sold all their inventory, they purchased more Mary Kay products through eBay at a low price, and later re-sold those products at higher prices.  As business grew, the Webers began to receive inquiries from individuals who wished to sell them Mary Kay products.  *Id.*  The Webers decided to set up an eBay store called "marykay1stop" to sell all the Mary Kay products they were amassing.  *Id.* at 3.

On approximately June 16, 2005, Mary Kay received an e-mail informing it of the presence of marykay1stop.  *Id.*  As a result, Mary Kay sent Amy Weber a letter which said that by offering Mary Kay products on eBay, she was in violation of her

IBC agreement. *Id.* After receiving no response, Mary Kay sent a second letter on July 29, 2005. *Id.* Again, Mary Kay received no response. On August 19, 2005, Mary Kay terminated the IBC agreement between Amy Weber and Mary Kay. *Id.* On November 3, 2005, Mary Kay contacted eBay and complained of the Webers' use of the Mary Kay name in marykay1stop. *Id.* Mary Kay sent a letter to Scott Weber demanding that he stop using Mary Kay's name in the marykay1stop store. *Id.* at 3-4. In response to this letter, Scott Weber contacted Nancy Pike ("Pike"), a paralegal in the Mary Kay legal department. *Id.* at 4. The Webers claim Pike told Scott that he could continue running the online store so long as he changed the name of the store so as to not include Mary Kay trademarks and removed all photographs copyrighted by Mary Kay. *Id.*

As a result of the conversation with Pike, the Webers changed the name of the store to Touch of Pink and created touchofpinkcosmetics.com, independent of the eBay store. *Id.* The couple also removed all copyrighted Mary Kay images from their websites. *Id.* By doing so, the Webers complied with all of Mary Kay's requests. *Id.* Today, the website touchofpinkcosmetics.com, and the Touch of Pink eBay store continue to sell Mary Kay products. The websites use the Mary Kay name. All the products sold by the defendants were purchased from current or former Mary Kay IBCs. The defendants do not alter the products they sell in any way. *Id.*

The court granted summary judgment in favor of the defendants on several of Mary Kay's claims. The court denied summary judgment, however, on the claims of (1) unfair competition under the Lanham Act, (2) passing off under the Lanham Act, (3) trademark infringement under the Lanham Act, (4) unfair competition under Texas common law, and (5) trademark infringement under Texas common law. These five claims were submitted to a jury. The jury found in favor of Mary Kay on all claims. The jury also found that the Webers had not demonstrated that they were protected from liability by the affirmative defenses of laches, the first sale doctrine, and the fair use doctrine.

## II. <u>ANALYSIS</u>

Based on the jury's verdict, the plaintiff now seeks an entry of judgment for the amount of $1,139,962.00, plus post-judgment interest. Mary Kay Inc.'s Motion for Entry of Judgment and for Permanent Injunction ("Motion") at 1. In addition, Mary Kay asks that the court enter a permanent injunction. *Id.* The court will discuss these two requests separately.

### A. <u>Motion for Judgment</u>

Mary Kay seeks entry of judgment for the amount of $1,139,962.00, plus post-judgment interest. *Id.* Both parties agree that this amount represents the defendants' pre-tax net profit for the years 2005 through 2008. Defendants' Response to Plaintiff's Motion for Judgment and for Permanent Injunction

- 4 -

("Response") at 21 (noting that the parties had stipulated to this amount). The defendants, however, argue that the law does not entitle Mary Kay to this amount. *Id.* at 19. According to 15 U.S.C. § 1117(a), a successful plaintiff in a trademark infringement case such as this one is entitled to the defendant's profits, "subject to the principles of equity." The defendants contend that here, "[e]quity weighs in favor of no profits being awarded." Response at 19.

The Fifth Circuit has outlined six factors for courts or juries to take into account when deciding whether equity weighs in favor of awarding the profits to the plaintiff. *Quick Technologies, Inc. v. Sage Group PLC*, 313 F.3d 338, 349 (5th Cir. 2002). This court instructed the jury to take these factors into account when deciding whether to award Mary Kay the defendants' profits. Court's Instructions to the Jury at 21-22. The Webers now urge the court to reconsider the jury's evaluation of these factors, arguing that "no reasonable jury, under the facts presented, could find that an accounting was appropriate." Response at 19. The defendants asserted an identical argument in their renewed motion for judgment as a matter of law. The court has already considered this argument in ruling on that motion and concluded that there was sufficient evidence presented at trial to support the jury's award of the defendants' profits to Mary Kay. Memorandum Opinion and Order 12-15. The court is not persuaded to reconsider that ruling on this motion.

The defendants also imply that even if there were sufficient evidence to support the jury's award of profits, the court should nonetheless reconsider this issue because "the ultimate decision of how much, if any, award is ultimately left to the discretion of the Court." Response at 19. The Webers assert that the jury's award of an accounting of the profits "is guidance only." *Id.* In essence, the defendants urge the court to ignore the jury's verdict on the question of profits and apply the six *Quick Technologies* factors anew. The court cannot do so. In *Quick Technologies*, the Fifth Circuit made clear that where the jury is the fact-finder, it should be the one to consider the six factors in determining whether a plaintiff is entitled to a defendant's profits. 313 F.3d at 349-50 ("In order to determine whether an accounting is appropriate, the court, *or the jury in this case*, considers the [six] factors.") (emphasis added). Here, the jury has done so and found in favor of awarding Mary Kay the defendants' profits. Thus, the principles of equity do not weigh against Mary Kay receiving the defendants' profits. Mary Kay is therefore entitled to an accounting of the defendants' profits under 15 U.S.C. § 1117(a).

The only remaining issue is whether Mary Kay is entitled to the pre-tax amount of the defendants' profits. In *L.P. Larson, Jr., Company v. Wm. Wrigley, Jr., Company*, 277 U.S. 97, 99-100 (1928), the Supreme Court held that where a trademark infringer engaged in "conscious and deliberate wrongdoing," the infringer may not deduct its federal income taxes from the profits made in calculating the

amount to which the plaintiff is entitled. Here, the jury held that the defendants had acted willfully and intentionally. Court's Instructions to the Jury at 24, 26, 28. The defendants do not contest that *L.P. Larson* applies here. Instead, they contend only that "a showing of willful infringement does not necessarily justify an award of profits if the defendant is adequately deterred from future infringement." Response at 21. This argument is unavailing. The defendants conflate the rule of *L.P. Larson* with the six factors used to determine whether the plaintiff should receive the defendant's profits in the first place. It is true that willfulness is one factor for a fact-finder to take into account when determining whether an accounting of the profits is appropriate. *Quick Technologies*, 313 F.3d 338, 349. Nonetheless, once the fact-finder has weighed all these factors and determined that an award of profits is appropriate, *L.P. Larson* requires that if the defendant acted willfully, he must surrender the pre-tax profits. The jury's finding that the defendants have acted willfully thus requires that the defendants turn over the profits earned during the relevant period without deduction of the federal income taxes paid on those profits. In short, Mary Kay is entitled to $1,139,962.00, which both parties agree is the pre-tax amount of profits the defendants earned from 2005 through 2008, plus post-judgment interest at the applicable legal rate. The court orders judgment in favor of Mary Kay on this issue.

B. <u>Motion for Permanent Injunction</u>

1. *Mary Kay is Entitled to an Injunction*

Mary Kay next asks that the court enter a permanent injunction against the defendants "to prohibit future acts of infringement, unfair competition, and passing off." Motion at 3. According to 15 U.S.C. § 1116(a), this court has "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark office." The Supreme Court has held that a plaintiff seeking a permanent injunction must satisfy a four factor test before a court may grant such relief. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The plaintiff must demonstrate "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.*

The defendants do not contest that an injunction is proper here. They "recognize that if the Court does not find cause to disregard the jury's verdict or grant a new trial, some relief is appropriate." Response at 1. Having made this concession, the defendants proceed to argue only that any injunction entered by the court should be narrow in scope. Nonetheless, the court will still evaluate the four factors laid out

in *MercExchange*, as the burden is on the plaintiff to establish that it is entitled to a permanent injunction.  *MercExchange*, 547 U.S. at 391.

### a.  Mary Kay Has Suffered an Irreparable Injury

Mary Kay argues that it has suffered an irreparable injury because the defendants caused a likelihood of confusion among consumers.  Motion at 3.  Mary Kay cites *Hawkins Pro-Cuts, Inc. v. DJT Hair, Inc.*, 1997 WL 446458, *7 (N.D. Tex. July 25, 1997), for the proposition that a likelihood of confusion "can constitute irreparable harm in a trademark case."  According to *Hawkins*, "if one trademark user cannot control the quality of the unauthorized user's goods and services, he can suffer irreparable harm."  *Id.*  The court agrees with this reasoning.  The jury found that the defendants operated their business in a way that caused confusion about their affiliation with Mary Kay.  Court's Instructions to the Jury at 23-28.  Allowing the defendants to operate their business in this way leaves Mary Kay powerless to control its image.  Thus, the court concludes that, without an injunction, Mary Kay will suffer irreparable harm.

### b.  Other Remedies are Insufficient

Mary Kay asserts that an accounting of the defendants' profits is insufficient to compensate Mary Kay because damage to goodwill and brand name is not easily quantified.  Motion at 5.  The court agrees.  As already discussed, the jury found that the defendants were operating their business in a way that suggested they were Mary

Kay.  Court's Instructions to the Jury at 23-28.  Without the ability to control the way in which the defendants sell their products in the future, Mary Kay is powerless to control its company image.  Thus, this factor weighs in favor of granting an injunction.

### c. The Balance of Hardships Favors an Injunction

As already held, Mary Kay will suffer irreparable harm if an injunction is not entered, as it will lose the ability to control the company image.  On the other hand, a permanent injunction will only require the defendants to bring their business into line with the requirements of the law.  Thus, this factor favors entry of an injunction, as well.

### d. An Injunction Will Not Disserve the Public Interest

Finally, the court finds that it serves the public interest for Mary Kay to be able to protect its public image.  The Supreme Court has held that the Lanham Act exists to insure that the owner of a trademark reaps the benefits of the goodwill of his business, *and* "to protect the ability of consumers to distinguish among competing producers."  *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 198 (1985).  Thus, the court finds that it is in the interest of the public that there be no confusion between the defendants and Mary Kay.  This factor weighs in favor of granting an injunction.

All four factors weigh in favor of an injunction. The court therefore grants Mary Kay's motion for a permanent injunction. All that remains is to determine the terms of the injunction.

2. *The Terms of the Injunction*

Mary Kay requests that the court enjoin the defendants from the following:

> 1) Promoting, advertising, offering for sale, selling, or otherwise distributing any Mary Kay products by using the name "Touch of Pink Cosmetics" or "MaryKay1Stop."
>
> 2) Promoting, advertising, offering for sale, selling, or otherwise distributing Mary Kay products that are beyond their shelf life or expiration date.
>
> 3) Promoting, advertising, offering for sale, selling, or otherwise distributing any Mary Kay product in a manner that suggests that the defendants are endorsed by, sponsored by, or otherwise affiliated with Mary Kay.

Motion at 9, 10, 13. In conjunction with this third request, Mary Kay asks the court to enjoin the defendants from engaging in fourteen activities, all of which it views as conduct that would suggest endorsement by or affiliation with Mary Kay. The court will address the plaintiff's three requests below. Before the court does so, however, it notes that the Fifth Circuit has stated that a "competitive business, once convicted of unfair competition . . . should thereafter be required to keep a safe distance away from the margin line even if that requirement involves a handicap as compared with those who have not disqualified themselves." *Chevron Chemical Company v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 705 (5th Cir. 1981), *cert. denied*, 457 U.S. 1126

(1982).  The court will keep this "safe distance" standard in mind when deciding the scope of the injunction.

> a.  The Defendants May Not Use the Name
> "Touch of Pink" or "MaryKay1Stop"

Mary Kay argues that the defendants have built a strong customer base over the past three years using the names "Touch of Pink Cosmetics" and "MaryKay1Stop."  Motion at 9.  The plaintiff points out that, during these three years, the defendants were conducting business in a manner that violated trademark infringement laws.  *Id.* at 9-10.  Mary Kay insists that the defendants "not be allowed to retain the goodwill that they have already misappropriated from Mary Kay" by continuing to use the names under which they have acquired a customer base.  *Id.* at 10.

The defendants do not address this exact argument.  Instead, they contend that Mary Kay does not own the words "touch" or "pink," and cannot control others' use of those words.  Response at 4-5.  Although true, this does not change the fact that, according to the jury, the defendants operated their website in a way that caused confusion and violated trademark law.  Court's Instructions to the Jury at 23-28.  In *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188, 207 (5th Cir. 1998), the Fifth Circuit held that the defendants' "advertising practices over many months imbued 'the Velvet Elvis' mark with a meaning directly related to Elvis Presley, which cannot now be erased by altering the context of the mark's use."  Thus, the court concluded

that the defendants had imbued the name "The Velvet Elvis" with an "infringing meaning" and that using it in the future would infringe on Elvis Presley Enterprises, Inc.'s mark.  *Id.*  Here, similarly, the jury found that the defendants violated federal and state trademark law.  After three years of operating Touch of Pink in a way that violated the law, it would be nearly impossible for the name "Touch of Pink" not to be imbued with "infringing meaning."  Thus, the court agrees with Mary Kay that the defendants should not be allowed to continue use of the name "Touch of Pink."

As for the name "MaryKay1Stop," the defendants argue that the court should not enjoin them from using it because they have not used it since January of 2006. Response at 6.  The Webers, however, began running MaryKay1Stop in early 2005, and continued to use that name until January of 2006.  Thus, the defendants operated under this name for approximately one year, which the court views as sufficient time to allow the name to become imbued with "infringing meaning."  The court therefore agrees with Mary Kay that the Webers should not be allowed to use the name "MaryKay1Stop" in the future.

b.  <u>The Defendants Cannot Sell Expired or</u>
<u>Past-Shelf Life Mary Kay Products</u>

Mary Kay next argues that the defendants should not be allowed to sell expired or past-shelf life Mary Kay products.  Motion at 10.  Generally, the first sale doctrine allows the sale of another mark owner's good, even without the mark owner's consent.  *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc. of Lafayette*, 988 F.2d 587,

590 (5th Cir. 1993). The first sale doctrine does not apply, however, if the defendant is selling goods that "materially" differ from the goods the mark owner sells. *Warner-Lambert Company v. Northside Development Corporation*, 86 F.3d 3, 6 (2nd Cir. 1996). Mary Kay argues, and the court agrees, that expired Mary Kay products materially differ from Mary Kay products sold by IBCs.

In *Warner-Lambert*, the Second Circuit considered whether a distributor of HALLS cough drops was liable for trademark infringement as a result of distributing expired cough drops. *Warner-Lambert*, 86 F.3d at 5-6. There, just as here, all parties conceded that the distributor was selling an expired product. The defendant, however, pointed out that the plaintiff itself sold some stale products. Since both the plaintiff and defendant were selling stale cough drops, the defendant argued that its products could not be "materially" different from the plaintiff's. *Id.* at 6. The court, however, disagreed. It reasoned that the mark holder was not required to use the most "stringent measures of insuring freshness" that were available. *Id.* Instead, to be entitled to relief, the mark holder must show only that "(i) it has established legitimate, substantial, and nonpretextual quality control procedures, (ii) it abides by these procedures, and (iii) the non-conforming sales will diminish the value of the mark." *Id.* As the court has stated in previous memorandum opinions and orders, it finds *Warner-Lambert* persuasive.

- 14 -

The court concludes that Mary Kay presented sufficient evidence at trial to satisfy these three elements. At trial, Renee Wickham ("Wickham"), Vice President of Product Quality at Mary Kay, testified that Mary Kay destroys any inventory it possesses that is within six months of its shelf life. Trial Transcript ("Tr.") at 328:2-4. Wickham also testified that Mary Kay makes efforts to educate its IBCs about the expiration dates and Mary Kay's preferred "first in first out" policy to prevent IBCs from selling products past their shelf-life to end consumers. *Id.* at 329-331. Finally, Wickham also testified that Mary Kay's satisfaction guarantee policy allows a consumer who buys an expired product from an IBC to return that product for a newer one. *Id.* at 331:6-18.

The defendants argue strenuously that these measures are insufficient. Response at 6-13. They contend that Mary Kay's measures of insuring that customers receive non-expired products are far less stringent than those used by the HALLS cough drop company in *Warner-Lambert*. *Id.* at 10-11. They note that HALLS informed both its wholesale and retail customers about the shelf life of the product. *Id.* at 10; *Warner-Lambert*, 86 F.3d at 5. HALLS also sent sales representatives to monitor the product's freshness. *Warner-Lambert*, 86 F.3d at 5. The defendants argue that, in contrast, Mary Kay takes no steps to insure the freshness of its products once those products have left the Mary Kay warehouse. Response at 10.

- 15 -

The court disagrees.  Although there are some difference between HALLS' and Mary Kay's practices, those differences do not require a different holding.  Just as HALLS did, Mary Kay informs its retailers -- the IBCs -- about the shelf life of the product.  Tr. at 328:2-4.  In addition, any Mary Kay product that qualifies as an over the counter drug, such as a sunscreen, includes an expiration date, just like HALLS' products.  Tr. at 423: 9-16.  This expiration date informed end consumers of the date upon which Mary Kay considered the product no longer viable.  Thus, the only difference between HALLS' practices and Mary Kay's is that HALLS sent out representatives to check the freshness of its products.  The court refuses to hold that a company must send out representatives to check on the freshness of its product before that company may stop a retailer from selling expired versions of its product.  The court believes that Mary Kay takes legitimate, non-pretextual measures to insure that it sells a minimal amount of expired products.  Although the court acknowledges that these measures are not nearly as stringent as they could be, the law does not require Mary Kay to take the most stringent measures possible.  *Warner-Lambert*, 86 F.3d at 6.

In short, the court finds that the defendants are selling products that materially differ from those sold by Mary Kay.  *Warner-Lambert* holds that expired goods materially differ from goods sold directly by the manufacturer of those goods, if the manufacturer takes legitimate, non-pretextual steps to insure that its products are

fresh. *Id.* Here, Mary Kay has done so. The only remaining question is whether the defendants have sold a sufficient volume of materially different products to diminish the value of Mary Kay's mark. *Id.*

The Webers argue that they have not sold a sufficient number of Mary Kay products to diminish the value of the Mary Kay mark. Response at 12. They argue that their $3.8 million in sales is minuscule compared to Mary Kay's $2.4 billion in sales. *Id.* While $3.8 million is unquestionably a small percentage of $2.4 billion, "[b]ad experiences by concentrations of consumers can lead to communications that mutually reinforce negative impressions about a mark." *Warner-Lambert*, 86 F.3d at 8. Here, Mary Kay presented evidence that the Webers had a large advertising campaign designed to attract attention to their website. Tr. at 502-513. Specifically, the Webers spend $20,000 each month on key word advertising via search engines. *Id.* Thus, the court concludes that the defendants reached a large enough concentration of consumers to diminish the value of the Mary Kay mark. The defendants may no longer sell expired or past-shelf life Mary Kay products.

c. <u>The Defendants May Not Suggest Endorsement by,</u>
<u>Sponsorship by, or Affiliation with Mary Kay</u>

Mary Kay's final request is that the defendants no longer be allowed to imply or suggest that they are endorsed by, sponsored by, or affiliated with Mary Kay. Motion at 13. The law could not be clearer that such behavior is not allowed. *Board of Supervisors for Louisiana State University v. Smack Apparel Company*, 550 F.3d 465,

489 (5th Cir. 2008). The question, of course, is what specific actions the defendants may no longer perform. Mary Kay requests that the defendant no longer perform fourteen specific acts. Motion at 13-14. The defendants apparently concede that six of these requests are appropriate, and assert that they have already complied with them.[*] Response at 14. Thus, the court rules in favor of Mary Kay on these six requests, and will prohibit the defendants from engaging in the following activities:

> 1) Using any portion of Mary Kay's product descriptions to describe the products for sale on the defendant's website.
>
> 2) Representing to consumers that products not currently in the defendant's inventory are on "backorder."
>
> 3) Representing to consumers that if they "need products that have future expiration dates" that they should "contact [their] local Mary Kay consultant to purchase those products."
>
> 4) Representing to consumers and Independent Beauty Consultants that "if your product is less than 12 months old, you can send them back to Mary Kay Inc. for 90% of wholesale."
>
> 5) Representing to consumers that Touch of Pink is a "one stop shop" for all of a consumer's Mary Kay needs.

---

[*] The court finds it irrelevant that the defendants have already complied with these six requests. The defendants may not avoid an injunction prohibiting these six actions in the future merely by complying with them before the court issues an injunction. See *Gates v. Cook*, 376 F.3d 323, 337 (5th Cir. 2004) ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.").

6) Representing to consumers that Touch of Pink carries authentic products from former consultants that have never been tested or used.

The court will address the remaining eight activities below, in the order in which the defendants address them in their response.

i. *Items Seven and Nine:*
*Relating to Purchase of Products from Former IBCs*

Number seven on Mary Kay's list asks that the defendants not represent "to consumers that they offer an outlet to reduce their slow moving product." Motion at 14. Number nine asks that the defendants not represent to consumers that Touch of Pink was established "by former Mary Kay consultants who are assisting consultants liquidate their inventory." *Id.* Mary Kay believes these statements represent to consumers that there is a relationship between the defendants and Mary Kay IBCs. Reply at 3.

As already discussed, the law forbids any activity that suggests endorsement by, sponsorship by, or affiliation with Mary Kay. *Smack Apparel*, 550 F.3d at 489. The court finds that by using language that suggests that the defendants act as an "outlet" for Mary Kay IBCs, they imply a relationship between the defendants and Mary Kay IBCs. One definition of the world "outlet" is "an agency (as a store or dealer) through which a product is marketed." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 838 (1984). Thus, the defendants' use of the word "outlet," in this context, suggests that the defendants are acting as an agent or dealer for Mary Kay

IBCs.  The phrase referred to in Mary Kay's ninth request also suggests a relationship between the defendants and Mary Kay.  Although the language cited by Mary Kay clearly states that the defendants are *former* Mary Kay consultants, the court concludes that, as authorized by the "safe distance" rule, it is wise to discourage the suggestion of *any* relationship between Mary Kay and the defendants, even one that has long since expired.  The court rules in favor of Mary Kay on these two requests.

ii.  *Item 2:  Use of Mary Kay's Catalogs,*
*Consultant Stickers, and Other Promotional Materials*

Mary Kay next seeks to prevent the defendants from selling Mary Kay catalogs, consultant stickers, sales aids, and any other "Section 2" items, which, generally speaking, are items other than actual cosmetics products.  Motion at 13.  The defendants concede that they should no longer sell Mary Kay catalogs, including the main Mary Kay catalog, the Look Book.  Response at 15.  The court will thus grant Mary Kay's request that the defendants no longer sell Mary Kay catalogs.

As to the other Section 2 items, a Mary Kay witness testified at trial that these items are "not products per say [sic] . . . [t]hey are business tools, literature, samplers."  Tr. 170: 1-7.  The jury heard at trial that at least some of these Section 2 items are unavailable to the public, and are instead sold only to IBCs.  Tr. 170: 8-12.  At first glance, one might conclude that a non-IBC selling items which are generally only available through an IBC would improperly suggest affiliation with Mary Kay.  The Fifth Circuit is clear, however, that "trademark law does not apply to the sale of

genuine goods bearing a true mark, even if the sale is without the mark owner's consent." *Matrix Essentials*, 988 F.2d at 590. In other words, it is not a violation of trademark law to sell another mark owner's genuine goods unless the *manner* in which the defendant sells those genuine goods improperly suggests endorsement by, sponsorship by, or affiliation with the mark owner. *Smack Apparel*, 550 F.3d at 489.

The plaintiff argued at length during the trial that the language, appearance, and tone of the defendants' website improperly suggested that the defendants were Mary Kay. The jury apparently agreed with Mary Kay on this question and decided that the defendants had infringed the plaintiff's trademark rights. Court's Instructions to the Jury at 23-28. The solution to this problem, however, is to require the defendants to alter the language, appearance, and tone of the website -- not to ban them from selling genuine Mary Kay goods in a proper manner.

Although a Texas court held in a previous case that a woman who "used Mary Kay shopping bags, brochures, and training videos" -- all of which would count as Section 2 items -- had improperly suggested affiliation with Mary Kay, the court finds that case distinguishable. *Graham v. Mary Kay Inc.*, 25 S.W.3d 749, 754 (Tex. App.-- Houston [14th Dist.] 2000, pet. den'd). In *Graham*, the defendant admitted that she *used* these Section 2 items in her retail business. *Id.* at 752. She had set up a cart at a local mall and was using these products to advertise and package her wares. *Id.* Using the Section 2 items in this way is clearly distinguishable from merely offering

these items for sale.  In short, sale of any genuine Mary Kay items, including Section 2 items, if done properly, is simply not unlawful and the court will not issue a broad ban on the defendants' selling such items.

### iii.  *Items 1 and 4: Use of Trademarks*

Mary Kay argues, in its first request, that the defendants should not be allowed to use Mary Kay's trademarks in any advertising, newsletters, or coupons except to identify the name of the products for sale.  The plaintiff also asserts, in its fourth request, that the defendants should not be allowed to purchase keywords containing Mary Kay's trademarks unless those keywords identify the specific products for sale by name.

The court finds these prohibitions to be slightly too broad. Under federal trademark law, it is lawful to use another's trademark, but only to the extent it is necessary to identify a product as having been manufactured by the mark owner. *Smack Apparel*, 550 F.3d at 489.  Thus, it is clear that the court must require the defendants to use only so much of the Mary Kay mark as is necessary to identify the products they are selling.  This holding does not mean, however, that the words "Mary Kay" may only appear directly before the name of a specific Mary Kay product.  Nor does it mean that the defendants may not purchase the words "Mary Kay" as a search term from search engines such as Google or Yahoo.  As the court discussed at length in its memorandum opinion and order on the defendants' motion

for summary judgment, the court finds search engines to be a valuable guide to internet users. The court stated that "the law will destroy the valuable resource that search engines have become if it prevents those search engines from doing what they are designed to do: present users with the information they seek as well as related information the user may also find helpful or interesting." Memorandum Opinion and Order at 27.

The court's holding does mean, however, that any use of the Mary Kay mark must exist for the sole purpose of informing customers that the defendants, as an entity entirely separate and distinct from Mary Kay, offer Mary Kay products for sale. Any use that implies affiliation with, sponsorship by, or endorsement by Mary Kay is unlawful. *Smack Apparel*, 550 F.3d at 489. Unfortunately, it is difficult to be more specific, as every use of a mark is different. The court notes, however, that the defendants should use caution every time they use the Mary Kay mark -- even if that use directly precedes the name of a specific Mary Kay product. Any use of the words "Mary Kay," without an explanation that the defendants are not Mary Kay and have no affiliation with Mary Kay, is suspect.

iv. *Items 8, 9, and 10*

Mary Kay's eighth and ninth requests ask the court to prevent the defendants from revealing that Amy Weber, or any Touch of Pink employee, is a former IBC, and, similarly, that Touch of Pink was established by former IBCs. Motion at 14.

The court has already addressed item nine above, and held that the defendants may not refer to a previous relationship with Mary Kay. Thus, these two requests are granted.

In its tenth request, Mary Kay asks that the court enjoin the defendants from representing to consumers that Touch of Pink provides "a place for consultants and consumers to locate hard to find and retired product or even new Mary Kay items at a great discount." The court will grant this request. As stated above, any use of the words "Mary Kay" that appears without an explanation that the defendants are not Mary Kay, and have no affiliation with Mary Kay, is suspect. Thus, stating that the defendants offer "Mary Kay items at a great discount" -- whether those items are hard to find or retired or new -- is suspect. The court therefore grants Mary Kay's tenth request, as well.

v. *Item 14: Catch All Item*

In its fourteenth request, Mary Kay asks the court to enjoin the defendants from "using Mary Kay's marks in any other manner likely to cause confusion regarding Mary Kay's sponsorship or affiliation of Defendant's future business." Motion at 14. As stated above, the law could not be clearer that such behavior is not allowed. *Smack Apparel*, 550 F.3d at 489 ("In order to avail oneself of the nominative fair use defense[,] 'the defendant (1) may only use so much of the mark as necessary to identify the product or service and (2) may not do anything that suggests

affiliation, sponsorship, or endorsement by the markholder.'").  Although an injunction that does little more than restate the law is rather vague and unhelpful, the defendants offer no good reason why the court should not broadly enjoin the defendants from violating the law.  Thus, the court will grant Mary Kay's fourteenth request.

### III.  CONCLUSION

For the reasons discussed above, the motion for a money judgment is **GRANTED**.  Within ten days of this date, counsel for the plaintiff shall submit a proposed form of judgment.

The motion for permanent injunction is **GRANTED** in part and **DENIED** in part.  The court will issue separately an order of permanent injunction that comports with the rulings made in this memorandum opinion and order.

**SO ORDERED**.

September 29, 2009.

_A. Joe Fish_

**A. JOE FISH**
**Senior United States District Judge**